**BOARD MACHINE, INC.,**
et al., Plaintiffs,

v.

The **UNITED STATES,** Defendant.

No. 98–504 C.

United States Court of Federal Claims.

May 9, 2001.

Douglas B. McFadden, Washington, DC, attorney of record for plaintiff, with whom was John M. Shoreman.

Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division,

U.S. Department of Justice, Washington, DC, attorney of record for defendant, with whom were David M. Cohen, Director, and Stuart E. Schiffer, Acting Assistant Attorney General. Katherine M. Kelly, U.S. Department of Justice; Margaret Jane Porter, Food and Drug Administration; and Karen Wagner, Department of Health and Human Services, of counsel.

## OPINION

DAMICH, Judge.

I. Introduction

This action is before the Court on Defendant's motion to dismiss Count I of the complaint for failure to state a claim upon which relief can be granted. Plaintiffs own and operate cigarette vending machines, and seek compensation for a regulatory taking of their property. Plaintiffs allege that the regulations promulgated by the Food and Drug Administration (FDA) in August 1996 which, inter alia, restricted the locations where the vending machines could be situated, eliminated all economically viable uses of the vending machines and impaired the vendors' placement contracts. These restrictions were invalidated in March 2000 by the Supreme Court which ruled that the FDA lacked the jurisdiction over tobacco to issue the regulations.[1] Defendant argues that because these regulations were issued without congressional authority, i.e., they were unauthorized or ultra vires (as opposed to authorized but illegal), they cannot form the basis of a compensable taking. For the reasons stated below, Defendant's motion is GRANTED.

II. Background

Plaintiffs own and operate cigarette vending machines which, pursuant to placement contracts, are installed in business establish-

ments. See Pls.' Am. Compl. (Compl.) ¶ 2. On August 11, 1995, the FDA asserted jurisdiction over cigarettes and smokeless tobacco under the Federal Food, Drug and Cosmetics Act (FDCA), 21 U.S.C. § 301 et seq. Id. at ¶ 7. FDA concurrently issued a notice of proposed rulemaking regarding the sale of cigarettes and smokeless tobacco to minors. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 126, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). The rule was designed to reduce youth smoking by restricting "the sale, distribution, and advertisement of tobacco products to young people." Id. The broad-ranging impact of this rule is evidenced by the fact that during the comment period the FDA "received over 700,000 submissions, more than 'at any other time in its history on any other subject.'" Id. at 126–27, 120 S.Ct. 1291.

The final rule was promulgated on August 28, 1996 ("Regulations Restricting the Sale and Distribution of Cigarette and Smokeless Tobacco to Protect Children and Adolescents"). Included in the rule were provisions restricting vending machine locations which applied to "any location where any person under eighteen would have access at anytime [sic]." Pls.' Br. in Opp'n to Def.'s Mot. to Dismiss (Opp'n) at 3 (emphasis in original).[2] Plaintiffs note that every one of their customers, despite being "adult only" establishments, would fail to fit under the FDA exemption because minors do or could have access to the premises as employees or during non-business hours. Compl. ¶ 10. The regulations were to become effective August 28, 1997. 21 C.F.R. Part 897 note. The end result was that the placement agreements were "terminated en masse" and Plaintiffs were forced to remove the vending machines from public locations nationwide. Compl. ¶ 14.

---

1. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

2. In the comments accompanying the final regulations, the FDA stated:

> FDA emphasizes that this narrowly drawn exemption accommodates adults only in locations where young people, in fact, have no access at any time.... A vending machine

would not be permitted in a facility that employs only adults but also permits employees to bring children to work. The agency further emphasizes that it is the exempt establishment[']s responsibility to ensure that no one under 18 is present, or permitted to enter the premises, at any time .... FDA emphasizes that the Final Rule exempts only establishments that are, in fact, inaccessible to young people at all times.
61 Fed.Reg. at 44450 (August 28, 1996).

Meanwhile, commencing in 1995, a group of tobacco manufacturers, retailers, and advertisers filed suit challenging the validity of the FDA's proposed regulatory program to restrict minors' access to cigarettes and smokeless tobacco. *See Coyne Beahm, Inc. v. FDA*, 966 F.Supp. 1374 (M.D.N.C.1997). The district court found the access restrictions valid on a summary judgment motion. *Id.* at 1400. The Court of Appeals reversed the district court's decision in *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir.1998). The Supreme Court affirmed, concluding, as the Fourth Circuit had, that the FDA lacked authority under the FDCA to promulgate regulations concerning tobacco products as customarily marketed. *Brown & Williamson*, 529 U.S. at 156, 120 S.Ct. 1291.

Plaintiffs claim that a taking was effected from the time of the FDA's issuance of the regulations on August 11, 1995, to their invalidation on March 21, 2000 (that is, during the period when the access restrictions were in place and "enforced"[3]), during which time it was effectively required to remove its machines from all public locations and deprived of "all economically viable uses of [its] property ... [and] customer placement agreements and commission arrangements." Compl. ¶¶ 20, 21. Plaintiffs characterize this as a temporary regulatory taking for which the Fifth Amendment to the Constitution requires the payment of just compensation. Defendant argues that *Brown & Williamson* and other precedent absolutely dictate dismissal on the basis that unauthorized or ultra vires acts of government officials cannot be imputed to the government and therefore cannot be the basis of a compensable taking.[4]

### III. Discussion

#### A. RCFC 12(b)(4)

"A motion to dismiss under Rule 12(b)(4) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy.... In reviewing the dismissal under Rule 12(b)(4), we are mindful that we must assume all well-pled factual allegations as true and make all reasonable inferences in favor of ... the nonmovant." *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998). "Dismissal under Rule 12(b)(4) is appropriate only when it is beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitled him to relief.... Because granting such a motion summarily terminates the case on its merits, courts broadly construe the complaint, particularly in light of the liberal pleading requirements under the Federal Rules of Civil Procedure." *Ponder v. United States*, 117 F.3d 549, 552–53 (Fed.Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998) (citations omitted; internal quotation marks omitted).

#### B. Compensable Takings and Requisite Authority

Plaintiffs specifically contend that the FDA effected a regulatory taking by enacting regulations "that so severely restricted the location of cigarette vending machines as to eliminate the place[ment] contracts." Opp'n at 3. Plaintiffs seek compensation for those placement contracts allegedly abrogated during the period between the issuance of FDA's notice of proposed rulemaking and the Supreme Court's determination that the FDA's regulations were invalid. *Id.* at 6.

---

**3.** Plaintiffs argue that the Government's contention, that the FDA regulations were stayed and never in fact went into effect, is belied by the (for example) 24,099 compliance checks conducted in 2000. *See* Opp'n at 6 (citing *FDA Children & Tobacco ComplianceChecker National Report* (updated Feb. 2, 2000) (<http://www.accessdata.fda.gov/scripts/oc/cftobacco/nationalreport.cfm>)). It is unnecessary to decide whether the regulations were stayed or active because this Court has determined that the FDA's actions were unauthorized and cannot form the basis of a compensable takings claim.

**4.** This is the third opinion in a series of five cigarette vending machine test cases arising out of the same set of operative facts. *See Brubaker Amusement Co. v. United States*, No. 98–511C (Fed.Cl. Jan. 12, 2001) (granting defendant's partial motion to dismiss because the FDA regulations concerning cigarette vending machines had been ruled invalid in *Brown & Williamson* and could not therefore be the basis of a temporary taking claim); *A–1 Amusement Co. v. United States*, 48 Fed.Cl. 63 (2000) (same).

The Fifth Amendment of the United States Constitution bars the government from taking private property for public use without paying just compensation. U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"). To obtain just compensation, a plaintiff alleging a taking of its property may bring suit against the government in the United States Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

It should be noted that temporary takings are no different from permanent takings, nor are physical takings different from regulatory takings, in that all require compensation.[5] *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). "An inverse condemnation action can be brought to recover compensation for a 'temporary' taking which denies the landowner all use of his property as well as for a permanent taking; for Fifth Amendment purposes, there is no difference between the types of taking." *Id.* at 319, 107 S.Ct. 2378. As for compensation when a taking is found, invalidation of the ordinance in *First English* was not a sufficient remedy, just as invalidation of the FDA tobacco regulations would not be just compensation, *see id.*, and "no subsequent action by the government can relieve it of the duty to compensate for the period of time for which the taking occurred." *Id.* at 321, 107 S.Ct. 2378.

In order to obtain compensation for a government taking, the act must be attributable to the sovereign. In that vein, "[a] compensable taking arises only if the government action in question is authorized." *Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed.Cir.1998) (citing *United States v. North Am. Transp. & Trading Co.*, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920)). In other words, "before a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed." *Boling v. United States*, 41 Fed.Cl. 674, 680 (1998) (quoting *Southern Cal. Fin. Corp. v. United States*, 225 Ct.Cl. 104, 634 F.2d 521 (1980)).

The question of authorization is the first inquiry in a takings assessment. *See Del–Rio*, 146 F.3d at 1362. In its discussion of authorization, the *Del–Rio* court explained that:

> While this court has on occasion referred to "invalid" or "illegal" government conduct as "unauthorized" for purposes of determining whether the conduct may give rise to Tucker Act liability, *see Short v. United States*, 50 F.3d 994, 1000 (Fed.Cir. 1995); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993), we understand those references to require a showing that the conduct was ultra vires, i.e., it was either explicitly prohibited or was outside the normal scope of the government officials' duties. Neither the Supreme Court nor this court has held that government conduct is "unauthorized," for purposes of takings law, merely because the

---

5. Regulatory takings and physical takings do diverge. The nature of the governmental action in a takings inquiry is one important factor in the analysis which serves to inform the direction of the court's analysis from the outset. *See Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). A physical taking suggests a significantly different analysis of the facts in which "[f]ederal law recognizes ... certain governmental actions entail such an actual invasion of private property rights that a constitutional taking must be implied." *Eyherabide v. United States*, 170 Ct.Cl. 598, 345 F.2d 565, 567 (1965) (citing extensive Supreme Court case history); *cf. Georgia Power Co. v. United*

States, 224 Ct.Cl. 521, 633 F.2d 554, 558 (1980) (calling *Eyherabide* "an extreme case" and stating that "[i]t was only with relation to these actual and extreme direct physical invasions by the United States that the court was able to grant relief from the damages caused by the supposed vandals."); *Woodland Mkt. Realty Co. v. City of Cleveland*, 426 F.2d 955, 959 (6th Cir.1970) (criticizing plaintiff-appellant's reliance on cases concerning a physical intrusion on property, including *Eyherabide*, in a case predicated on a taking theory involving no actual invasion). Whereas, in cases of inverse taking without physical invasion, the Court of Claims "has been careful to consider the role of Congress...." *NBH Land Co. v. United States*, 217 Ct.Cl. 41, 576 F.2d 317, 319 (1978).

conduct would have been found legally erroneous if it had been challenged in court. 146 F.3d at 1363. While the Government can be held accountable for an authorized act, "when a government official engages in ultra vires conduct, the official 'will not, in any legal or constitutional sense, represent the United States,'" meaning that the Government cannot be held liable. *Id.* at 1362 (quoting *Hooe v. United States*, 218 U.S. 322, 335, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055 (1910)); *see N. Am. Transp. & Trading Co.*, 253 U.S. at 333, 40 S.Ct. 518 (for government to be held liable, it must appear that the officer who has physically taken possession of the property was duly authorized to do so, either directly by Congress or by the official upon whom Congress conferred the power, or that the action of the officer was subsequently approved or ratified); *Hughes v. United States*, 230 U.S. 24, 35, 33 S.Ct. 1019, 57 L.Ed. 1374 (1913).

■ Thus the "authority" dimension of takings analysis is well established. Yet, some latitude is retained to the courts in determining whether this authority exists in individual cases. "In a case ... in which the alleged taking consists of regulatory action that deprives the property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, i.e., if their actions are a 'natural consequence of Congressionally approved measures,'" *Del–Rio*, 146 F.3d at 1362 (quoting *NBH Land Co. v. United States*, 217 Ct.Cl. 41, 576 F.2d 317, 319 (1978)), or are pursuant to "the good faith implementation of a Congressional Act." *Id.* (quoting *S. Cal. Fin. Corp.*, 225 Ct.Cl. 104, 634 F.2d 521, 525). Authorization may also be imputed "by necessary implication." *Hooe*, 218 U.S. at 336, 31 S.Ct. 85.

Central to a successful argument incorporating any of the above principles would be a showing by plaintiff of ambiguity, silence or acquiescence on the part of Congress as to agency authority, because, as then-Judge Scalia explained, takings claims have a remedy if the *"taking occurs while the government actor is acting within the general scope of his duties, unless Congress has expressed a positive intent to prevent the taking or*

*exclude government liability."* *Del–Rio*, 146 F.3d at 1362–63 (quoting *Ramirez de Arellano v. Weinberger*, 724 F.2d 143, 151 (D.C.Cir.), *rev'd* 745 F.2d 1500 (D.C.Cir.) (en banc), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985) (emphasis added)).

### C. Plaintiffs' Arguments

■ Plaintiffs specifically claim that a taking can occur when government action is taken in good faith and is within the agency's general scope of authority. Plaintiffs principally rely on *Del–Rio*, but this does not rescue them from *Brown & Williamson*, in which the Supreme Court determined that Congress expressly denied the FDA the authority to promulgate its tobacco regulations, with the result that the regulations cannot come within the agency's general scope of authority.

In *Del–Rio*, the government erroneously believed that rights-of-way approved by the Indian tribe were required for drilling permits for mineral leases on Indian lands. As such, the permits were denied. The lease holders sued claiming that the leases were taken. The Court of Federal Claims dismissed the takings claim, holding that there could not be a taking if the government belief that the right-of-way was required was legally erroneous. The Federal Circuit reversed, ruling that the agents were acting within their authority even though their conduct was not legal. *Del–Rio*, 146 F.3d at 1363. The court held that government conduct that is invalid requires compensation if undertaken in good faith and within general authority—but that is to be contrasted with conduct that is "ultra vires, i.e., ... either explicitly prohibited or [ ] outside the normal scope of the government officials' duties." *Id.* The court wrote that "[m]erely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law." *Id.* at 1362. It was part of the Interior Department Officials' statutorily authorized duties to interpret the regulations governing federal mineral leases, and "there is no reason to suppose that their decision [to

deny the permits] reflected anything but a good faith effort to apply the statutes and regulations as they understood them.... In short, the officials ... had 'the authority to regulate the proposed mining.' " *Id.* at 1363 (quoting *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed.Cir.), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987)).

Plaintiffs attempt to read *Del–Rio* too broadly, so that good faith and general authority would trump express congressional disapproval. In this particular case, the FDA may have arguably acted in good faith, but its tobacco regulation, as *Brown & Williamson* makes absolutely clear, was not in fact within its general scope of authority.

Plaintiffs endeavor to establish that since it is within the authority of the FDA generally to issue regulations regarding food and drugs under the FDCA, regulating tobacco was not a matter of lacking authority, but rather of exceeding authority while still not exceeding the greater general scope of its jurisdiction. Plaintiffs' argument that the FDA acted beyond its authority rather than without authority (merely illegal rather than unauthorized) in essence translates to: the FDA had the pre-existing authority to regulate tobacco in some limited fashion, and vending machines were outside of this limit but not outside the agency's general regulatory scope. Therefore, Plaintiffs would argue, the actions were authorized by virtue of the subject matter but nonetheless illegal, as opposed to unauthorized. This is a "chicken-egg" argument which cannot succeed in the wake of *Brown & Williamson* and which misapprehends *Del–Rio* in that it attempts to stuff an "unauthorized but lawful" claim into the "authorized but illegal" *Del–Rio* mold. This cannot yield a compensable claim because "Government action which exceeds 'valid statutory authority' cannot give rise to a takings claim." *A–1 Amusement Co. v. United States*, 48 Fed.Cl. 63, 68 (2000) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 695, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)).

While an act is not unauthorized merely because it is "mistaken, imprudent, or wrongful," *Eyherabide v. United States*, 170 Ct.Cl.

598, 606, 345 F.2d 565 (1965), or later found "contrary to law," *Del–Rio*, 146 F.3d at 1358, an act cannot be contrary to law if no jurisdiction (i.e., enabling law) existed in the first place. An act must first be within the scope of jurisdiction in order to later be found authorized but illegal. The Court in *Brown & Williamson* unambiguously ruled that Congress explicitly denied the necessary prime authority to the FDA. In sum, the Court held that Congress had directly spoken given that: (1) FDA authority and regulation would be inconsistent with FDCA and its distinct regulatory regime, (2) Congress repeatedly rejected proposals to give jurisdiction and blocked FDA from exercising authority in the area, and (3) Congress' tobacco-specific legislation effectively ratified FDA's previous position that it lacked jurisdiction. *See Brown & Williamson*, 529 U.S. at 142, 147, 156, 120 S.Ct. 1291; *see also Marks v. United States*, 34 Fed.Cl. 387, 409 (1995) ("to assert a taking claim, the government must *have had* the authority to regulate the proposed activity") (emphasis added).

Accordingly, a plaintiff in a takings case must "concede the correctness of the government action that is alleged to constitute the taking" because "the plaintiff ... cannot assert that the government conduct was unauthorized, since conduct by a government official who is acting ultra vires cannot effect a governmental taking...." *Del–Rio*, 146 F.3d at 1364; *see* 28 U.S.C. § 1491 (takings claimant must concede the validity of the government action to have Tucker Act jurisdiction); *Florida Rock*, 791 F.2d at 899 (to assert a takings claim, the government must have had the authority to regulate the proposed mining activity); *cf. A–1 Amusement*, 48 Fed.Cl. at 67–68 (cigarette vending machine plaintiff's argument that the FDA's conduct was "unauthorized but lawful" is "untenable").

The circumstances of this case, in which Congress directly spoke to authority, prevent Plaintiffs from more forcefully asserting that a broader reading of authority is available to them based on congressional ambiguity, silence, or acquiescence. In such cases, where statutory authority exists, the authorization

is concomitant with the scope of the actor's duties. Nevertheless, there is little, if any, latitude available in this case. For example, the argument that these FDA regulations were a "natural consequence of congressionally approved measures" or "good faith implementation of a congressional act" is of no avail. The FDA is recognized as a regulatory agency with broad statutory powers, but the authority to regulate tobacco in any significant manner was not only never granted, but was explicitly denied to the agency. As such, FDA's actions cannot be a natural consequence of their general regulatory capacity. The good faith implementation argument also fails because the regulations did not arise out of a congressional act, but were initiated by the FDA when it first asserted jurisdiction in August of 1995. If, for example, FDA had the authority to regulate certain aspects of tobacco but there was no specific boundaries established, or Congress was silent as to vending machines, then this would be a reasonable argument. But again, "[t]he government action upon which the takings claim is premised must be authorized, either expressly or by necessary implication, by some valid enactment of Congress." *Short v. United States*, 50 F.3d 994, 1000 (Fed.Cir.1995).

In addition, the Supreme Court's refusal to grant any *Chevron* deference to the FDA underscores the fact that Congress spoke directly to the issue of FDA jurisdiction, and therefore Plaintiffs cannot argue that the regulations were "authorized by necessary implication" as a result of an ambiguous mandate.[6] *See Brown & Williamson*, 529 U.S. at 160, 120 S.Ct. 1291.

Second, Plaintiffs might have asserted that Congress effectively sanctioned the regulations when it disbursed funds in response to FDA's proposed budget, including for implementation of the erstwhile regulations. Plaintiffs would argue that because Congress disbursed funds to the FDA to implement the rule, that it conferred tacit approval, even though the committee expressly reserved judgment.[7] The problem with this argument is that Congress cannot implicitly ratify ultra vires acts. "[A]n executive agency is not authorized to take steps resulting in a compensable taking where Congress has refused to authorize such a taking or properly expects that no such taking can occur unless specified procedures involving Congress are followed." *S. Cal. Fin. Corp.*, 634 F.2d at 524. As the Court stated in *Brown & Williamson*, "we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." 529 U.S. at 160, 120 S.Ct. 1291.

FDA's actions were clearly outside the scope of their authority, i.e., ultra vires, and therefore Plaintiffs cannot on the basis of those regulations state a claim for which relief can be granted.

### D. When is an act unauthorized in the takings context?

The court recognizes that it may seem inequitable to the plaintiffs and to the citizens of the United States that the more egregious acts, the ones that are completely unauthorized, cannot be compensated as takings, whereas less offensive government acts that are "merely illegal" qualify for remuneration. Yet, it is also unfair to impute the actions of a "rogue" government official to the United States. In a democracy it is important that law and citizens' expectations of justice come together as much as possible.

6. Agencies are generally entitled to deference in their interpretation of statutes under their charge to administer unless Congress has unambiguously expressed its intent with regard to the question at issue, or if, in the absence of express intent, the agency applies a permissible construction. *See Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (if "Congress has directly spoken to the precise question at issue," the court "must give effect to the unambiguously expressed intent of Congress. [I]f the statute is silent or ambiguous" the court must determine whether the agency's interpretation "is based on a permissible construction of the statute.")

7. The FY 1998, 1999, and 2000 Senate Reports accompanying the appropriations bills each reserve judgment as to FDA's authority, stating: "The Committee emphasizes that its action is in no way to be construed as concurring or disagreeing with any court ruling regarding FDA's authority to implement its tobacco rule or the proposed tobacco settlement." S. REP. NO. 106–80 (1999).

In the context of agency action, a citizen is more likely to accept the principle of non-recovery for unauthorized taking where the agency's action is clearly outside the general scope of its authority, say, where the Federal Communications Commission (FCC) regulates airplanes instead of airwaves. Indeed, in such a case, the regulation may raise such a question that it is not initially obeyed, with the result that no taking occurs. For example, if the establishments in this case had received an order from the FCC to remove cigarette vending machines from their premises, they might have asked for clarification before complying, and a lawsuit would have been avoided. Thus, in attempting to harmonize the two principles, it seems wise to define as narrowly as possible the ambit of unauthorized acts, so as to minimize those situations in which a citizen's property is taken by an ostensible government act and no compensation is available.

The need to adopt this principle would be less pressing if alternative theories of recovery might be pursued. But, in the case at bar, at least, no other viable avenue of recovery seems available, that is, when the government's act is held to be unauthorized. A procedural due process claim is not viable because there are no allegations of impropriety in the FDA's rulemaking, and asserting such a claim in connection with actions taken during the post-rulemaking period seems equally unlikely for success because there is no link between the harm and the cause of action.[8] Tort seems unfavorable because, even if Plaintiffs could target an individual employee, *Brown & Williamson* has foreclosed the issue of whether the actions were taken within the scope of employment.[9] Constitutional tort is most likely pre-

---

8. Regulatory takings are subject to procedural due process challenges. *See, e.g., Lake Country Estates v. Tahoe Reg'l Planning Agency (TRPA)*, 440 U.S. 391, 399–400, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). In *Lake Country Estates*, at 440 U.S. 391, 394–95, 397 n. 11, 99 S.Ct. 1171, the Court declined to address the question of whether petitioners who "asserted [in the takings context] that the alleged violations of the Fifth and Fourteenth Amendments gave rise to an implied cause of action, comparable to the claim based on an alleged violation of the Fourth Amendment recognized in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619," and whether the "allegations of 'taking,' even though phrased in terms of inverse condemnation, are sufficient to show that appellants complained that the TRPA exercised its police powers improperly, and that they relied on the due process clauses of the Fifth and Fourteenth Amendments."

Plaintiffs would be hard-pressed to assert the due process claim because if they cannot show a valid harm, i.e., authorized taking, they cannot generally claim a deprivation of constitutional rights sufficient to support a due process claim. In other words, without prevailing in their takings claim, they cannot go forward because there must be an inadequate post-deprivation remedy to proceed with the due process claim unless Plaintiffs could show a harm distinct from the takings allegations. Otherwise, the argument that Plaintiffs were denied appropriate process during the rulemaking seems unconvincing given that during the comment period, the FDA "received over 700,000 submissions, more than 'at any other time in its history on any other subject.'" *Brown & Williamson*, 529 U.S. at 126–27, 120 S.Ct. 1291; *cf. Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)

(finding a deprivation of property, the Court continued its analysis to decide whether the deprivation occurred without due process), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Szymkowicz v. District of Columbia*, 814 F.Supp. 124, 129 (D.D.C.1993) ("[s]ince the Court does not find a taking, plaintiffs' Fifth Amendment rights have not been violated and it is not necessary to determine if the procedures established by the District to contest parking tickets satisfy due process"; the court "need not decide if a deprivation short of a taking is entitled to due process").

Substantive due process and equal protection claims have been brought in conjunction with takings claims. In this case such claims are baseless, regardless of the fact that the regulations were later invalidated, given that the regulations did not discriminate against a suspect class (cigarette vending machine owners), and are economic and social in nature and at least rationally related to a legitimate state interest.

9. A tort claim is theoretically possible in another court. While the Court of Federal Claims has jurisdiction over Fifth Amendment taking claims resulting "from authorized acts of government officials," claims based on "unauthorized acts of government officials sound in tort" and the Court of Claims lacks jurisdiction. *Brown v. United States*, 35 Fed.Cl. 258, 266 (1996).

Plaintiffs likely could not proceed under the Federal Tort Claims Act (FTCA), which provides a "limited waiver of the United States' sovereign immunity ... for money damages, for injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his

cluded on the ground that such claims under the Fifth Amendment probably apply only to liberty and not property violations.[10] Finally, no state remedy appears viable because under these facts, this motion does not involve any action by state officials.[11]

Because compensation is not available for unauthorized governmental acts under a takings analysis and because recovery does not seem to be available under other theories, future courts might consider a broader conceptualization of "authorized" for takings analysis purposes, the foundation of which is

that an act is presumed to be authorized if it is arguably within the scope of the actor's duties, unless clearly precluded.

The regulatory takings cases that have come to the court's attention in which there is no clear preclusion (unlike the case at bar) are characterized by ambiguity, silence or acquiescence on the part of the Congress or the agency with regard to authority.[12] In such cases, courts should focus on the general scope of agency authority as envisioned by Congress in the agency's organic law and

office or employment, under circumstances where the United States, if a private person, would be liable to the claimant...." *O'Ferrell v. United States,* 968 F.Supp. 1519, 1526 (M.D.Ala. 1997) (summarizing the FTCA and its parameters). One obstacle for Plaintiff in a tort suit would be lack of authorization, another sovereign immunity. First, the scope of employment issue has been settled by *Brown & Williamson.* Second, either the discretionary function exception or the intentional torts exception to the FTCA would likely apply to preclude government liability. *See* 28 U.S.C. § 2680(a), (h); *O'Ferrell,* 968 F.Supp. at 1526–27 (summarizing when the discretionary function exception applies; intentional torts exception precludes an action for abuse of process or interference with contractual rights).

**10.** A *Bivens* action does not appear to be an option in a court of competent jurisdiction. In *Bivens* the Court held that an individual may sue federal officials acting under color of authority for violation of that individual's constitutional rights. *Brown,* 35 Fed.Cl. at 267. A *"Bivens* claim against individual officers is not the same claim as [an] action against the United States," *Earnest,* 33 Fed.Cl. at 345, and the Court of Federal Claims lacks jurisdiction over claims against federal officials as opposed to the Government. *Brown,* 35 Fed.Cl. at 267. Plaintiff would face a number of obstacles. First, *Bivens* claims under the Fifth Amendment probably only encompass "liberty" violations and not "property" violations. In *Lake Country Estates,* 440 U.S. at 398, 99 S.Ct. 1171, the issue was argued before the Court that the *Bivens* rationale does not apply to a claim based on the deprivation of property rather than liberty, and therefore the Court of Appeals' jurisdictional analysis was defective, but the Court did not decide the issue. In addition, a *Bivens* cause of action cannot be brought against a federal agency. *See F.D.I.C. v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Also, Plaintiffs would have to show that otherwise adequate remedies were unavailable. *See* 14 Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3655 (*"Bivens* subsequently has been extended to include claims against governmental agents

based on the violation of other constitutional provisions ... however ... no *Bivens* remedy is available if Congress has provided [other adequate remedies, and] the court should not grant relief when doing so would put an intolerable burden upon the execution of governmental functions.")

**11.** This motion to dismiss does not involve any action by state officials and Plaintiffs do not assert here a claim severed from the federal claim. Had this been a case of a state actor operating under color of state law, Plaintiffs could have pursued any of these theories in the context of a § 1983 action which "creates a duty to refrain from interference with the federal rights of others, and provides money damages and injunctive relief for violation of that duty." *City of Monterey v. Del Monte Dunes at Monterey Ltd.,* 526 U.S. 687, 723, 119 S.Ct. 1624, 143 L.Ed.2d 882 (Scalia, J., concurring). " '§ 1983 creates a species of tort liability.' " *Id.,* 526 U.S. at 709, 119 S.Ct. 1624 (quoting *Heck v. Humphrey,* 512 U.S. 477, 483, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). Takings cases are often brought under § 1983 as a violation of the Fifth Amendment against local agencies. *See Dolan v. City of Tigard,* 512 U.S. 374, 383, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *see, e.g., Lake Country Estates,* 440 U.S. at 399–400, 99 S.Ct. 1171 (successful § 1983 claim for unconstitutional taking); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1200 (5th Cir. Unit A) (property owner had § 1983 cause of action for damages for taking), *reh'g denied,* 649 F.2d 336 (per curiam), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *City of Austin v. Teague,* 570 S.W.2d 389, 394–95 (Tex.1978) (same); *cf. Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (city not immune from liability under § 1983 where defendant harmed by abuse of government power).

**12.** *See also supra,* note 5, discussing the physical-regulatory takings distinction and the suggestion it makes that in the case of regulatory takings, congressional ambiguity, silence or acquiescence as to agency actions allows for a broader conceptualization of "authorized."

consider as a factor how the scope of the agency's authority is perceived by reasonable persons.[13] For example, absent the determination that Congress had directly spoken to the issue, it would seem that the act in the case at bar would not be unauthorized for takings purposes, because it was arguably within the general regulatory capacity of the FDA. Four Justices of the Supreme Court were convinced that the FDA had the authority, and it would seem also that a reasonable person might assume that the agency would have the authority to regulate tobacco.

*Chevron* analysis provides a helpful paradigm.[14] In the broader invalidation context, when a court applies *Chevron*, it seeks to ascertain whether Congress spoke directly to an issue so as to determine the requisite deference to be accorded the agency's interpretation. If Congress was not unambiguous, the agency is generally deferred to. Similarly, in the takings context, the analyst should similarly look to see, first, whether the agency has the broad underlying statutory authority to regulate within the particular field. Second, the focus should be on whether the authority has been expressly denied to the actor or agency because a "[a] Tucker Act remedy lies if a taking occurs while the government officer 'is acting within the normal scope of his duties ... unless Congress has expressed a positive intent to prevent the taking or to exclude government liability.'" *Del–Rio*, 146 F.3d at 1362–63; *see Larson*, 337 U.S. at 695, 69 S.Ct. 1457 ("if the actions of an officer do not conflict with the terms of his valid statutory authority then they are the actions of the sovereign, whether or not they are tortious under general law.") When Congress outlines what procedures are necessary to secure authority, failure to follow these guidelines also constitutes express disapproval. Stated differently, requisite authority is expressly denied if Congress dictates that but for certain necessary procedures authorization would be lacking.

In general, then, lack of authority should be predicated on a showing of clear preclusion of the jurisdiction or failure to follow procedures necessary to secure authority. If Congress has not clearly disapproved of an act (or clearly delineated the procedures for securing authority), then authority should be presumed if the actor is within its general scope.

Note that this is not a "good faith" standard, as argued by Plaintiff in this case. While "[r]ecovery under the Tucker Act has been permitted when a taking by an officer is the natural consequence of congressionally approved measures or the result of an exercise of discretion granted to an official for an implementation of a congressional statute," *Del–Rio*, 146 F.3d at 1363 (quoting *Ramirez de Arellano*, 745 F.2d at 1523–24), this still does not buoy Plaintiff's "good faith implementation" argument because even under a "looser" interpretation, *the requirement of authority is mandatory and not fulfilled by good faith alone.*

Defendant does not cite to authority which would preclude a court in the takings context from adopting such a stance; that is, Defendant does not point to cases in which a court found that the government performed an unauthorized act in the absence of an express statement of no authority.

*Coast Indian Cmty. v. United States* is a case of unauthorized conduct. 213 Ct.Cl. 129, 550 F.2d 639 (1977). There, local Bureau of Indian Affairs officials conveyed a right-of-way owned by the local Indian community. The only authority permitting the conveyance was that vested in the Secretary of the Interior and delegated by him to the BIA and its local agencies. *Id.* at 650. This broad power was restricted by the requirement that consent of the Indian occupants be obtained before making a conveyance. *Id.* "The local BIA officials were legally bound to

---

**13.** Of course, agency action could not be authorized where it was not within the general scope of the agency's authority even if reasonable persons would think otherwise. The view of the reasonable person would be a factor to consider in determining the general scope of the agency's authority.

**14.** *See supra,* note 6. *Chevron* is only a paradigm because in *Chevron*-type cases the agency will be defending its exercise of authority, while in takings cases the agency will be arguing that the action was unauthorized.

follow the statutory and regulation-based procedures in the course of executing the conveyance, and any conveyance in violation of those procedures necessarily amounted to an unauthorized act...." *Id.*

Similarly, in *S. Cal. Fin. Corp. v. United States*, the Government's action was unauthorized. 225 Ct.Cl. 104, 634 F.2d 521 (1980). The Air Force was not empowered to take a fee or perpetual easement on plaintiff's land. Authority could only be given by specific congressional consent in a Military Construction Appropriation Act. *Id.* at 523. This reservation of authority requiring approval means that failure to follow procedures is unauthorized and the functional equivalent of express disapproval.

Defendant cites several other cases, all of which support the general authority requirement, and none of which convinces this court that the rule it suggests for future takings cases to distinguish authorized from unauthorized government activity is inconsistent with precedent. *See also Short v. United States*, 50 F.3d 994, 1000 (Fed.Cir.1995) ("The government action upon which the takings claim is premised must be authorized, either expressly or by necessary implication, by some valid enactment of Congress."); *Florida Rock*, 791 F.2d at 898–99 (discussing determination of authority question and noting that general authority to "regulate the proposed mining as a de jure pollution ... of federal waters," rather than the specific authority, "to acquire the 98 acres ... on behalf of the United States," was the appropriate measure); *Armijo v. United States*, 229 Ct.Cl. 34, 663 F.2d 90, 95–97 (1981) (finding authorization in an ambiguous context, arising from congressional intent shown by knowledge of the actions taken to acquire land for a missile range; the actions were

illegal, but at the same time within the actors' general scope of authority to take leasehold interests); *NBH Land Co. v. United States*, 217 Ct.Cl. 41, 576 F.2d 317, 319 (1978) (dismissing takings claim where Congress twice expressly rejected Army requests for authority and funds to acquire land). In *Marks v. United States*, 34 Fed.Cl. 387, 409–10 (1995), the government's mistaken actions relating to the portion of land above the mean high water line were unauthorized because the land was outside the Government's jurisdiction. Therefore, the actions could not be merely legally erroneous and ground for takings claims. By comparison, in *Del–Rio*, 146 F.3d at 1363, the agency's mistaken actions were merely legally erroneous and grounds for a takings claim because the actors had the requisite authority and were within their scope.[15]

By presuming authority under the strictures outlined above, the category of unauthorized (uncompensated) takings could be limited to the most extreme cases where the activity would also be ultra vires under *Chevron*, as if, hypothetically, the FDA had no authority to regulate tobacco, or had the general authority to regulate tobacco but Congress had expressly disavowed authority over vending machines, or where Congress was not unambiguous with regard to vending machines but the FDA's regulation of that area was not a reasonable implementation of congressional intent.

■ Again, it should be emphasized that this is a case where Plaintiffs allegedly suffered some economic harm directly attributable to the FDA's regulations. Nevertheless, the lack of FDA authority was unmistakable. This court simply believes

---

15.  *Tabb Lakes Ltd. v. United States*, 10 F.3d 796 (Fed.Cir.1993) merits note for its treatment of mistaken actions and jurisdiction. In that case, the question of authority was unsettled because the Fourth Circuit had ruled that the Army Corp of Engineers' assertion of jurisdiction over plaintiff's land was procedurally defective because it had not complied with APA notice and comment provisions. *Id.* at 799. The Corps did not concede the issue and did not raise unauthorization as a defense. *Id.* at 803. The Federal Circuit, in accord with the Ninth Circuit, believed that "its assertion of jurisdiction respecting the wetlands

was, *prima facie*, within its authority and cannot be considered *ultra vires*." *Id.* As such, the court "reject[ed] Tabb Lakes' theory that compensation for a taking must be paid where a mistake is made in [subjecting plaintiff to] the Corps' permit process" and wrote that "[a] mistake may give rise to a due process claim, not a taking claim." *Id.* If the Corps did not have jurisdiction then the mistake could not be the basis for a takings claim, but if it did, then it could be, as in *Del–Rio*, if the facts evidence that a taking has occurred.

that a presumption in favor of "authorization" is warranted, in cases of congressional ambiguity, silence or acquiescence, where the agency is enabled by statute, and the taking is effectuated by an actor arguably within its scope, taking into account a reasonable person's view.

III.  Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss is GRANTED.[16]  The Clerk of the Court is directed to enter judgment for Defendant and to dismiss the complaint with prejudice.  No costs.

16.  The present motion was filed as a partial motion to dismiss because Count II of the complaint was stayed pending exhaustion of appeals in *B & G Enters., Ltd. v. United States,* 43 Fed.Cl. 523 (1999), *aff'd,* 220 F.3d 1318 (Fed.Cir.2000), *reh'g denied* (in banc) (Aug. 22, 2000), *cert. denied,* — U.S. —, 121 S.Ct. 1079, 148 L.Ed.2d 956 (2001).  On March 2, 2001, this Court granted Plaintiffs' motion to dismiss Count II in light of the Supreme Court's denial of the petition for a writ of certiorari.  With only Count I remaining, Defendant's motion becomes a dispositive motion.